**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KOHLI PRATYUSH, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FULL TRUCK ALLIANCE CO. LTD., PETER HUI ZHANG, SIMON CHONG CAI, COLLEEN A. DE VRIES, MORGAN STANLEY & CO. LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, GOLDMAN SACHS (ASIA) L.L.C., and COGENCY GLOBAL, INC., <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Kohli Pratyush ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Full Truck Alliance Co. Ltd. ("FTA" or the "Company"), as well as media and analyst

1

reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.     Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired FTA's securities pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with FTA's June 2021 initial public offering (the "IPO" or "Offering") and suffered compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2.     In June 2021, Defendants held the IPO, offering approximately 82,500,000 American Depositary Shares ("ADSs") to the investing public at $19.00 per ADS.

3.     By the commencement of this action, FTA's ADSs trade below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4.     The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 771(a)(2) and 77o.

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

7.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and

the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of FTA securities in this District.

## PARTIES

8.    Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities pursuant and/or traceable to the IPO and was damaged thereby.

9.    Defendant FTA purports to, with its subsidiaries, operate a digital freight platform that connects shippers with truckers to facilitate shipments in the People's Republic of China ("PRC"). It offers freight listing, matching, and brokerage services; and online transaction services, as well as various value-added services. *Yunmanman* and *Huochebang* were founded in 2013 and 2011, respectively, and both companies were digital freight platforms in the PRC prior to their merger which created FTA in 2017.

10.    The Company is incorporated in the Cayman Islands and its head office is located at No. 123 Kaifa Avenue, Economic and Technical Development Zone, Guiyang 550009, PRC. FTA securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "YMM."

11.    Defendant Peter Hui Zhang ("Zhang") was at the time of the IPO the Company's Chief Executive Officer and Chairman of the Board of Directors.

12.    Defendant Simon Chong Cai ("Cai") was at the time of the IPO the Company's Chief Financial Officer.

13.    Defendant Colleen A. De Vries ("De Vries") was at the time of the IPO FTA's duly authorized representative in the United States. Defendant De Vries signed the false and

misleading Registration Statement on her own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant De Vries' employer.

14.     The Defendants named in ¶¶ 11-13 are sometimes referred to herein as the "Individual Defendants."

15.     Each of the Individual Defendants signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and promotions to meet with and present favorable information to potential FTA investors, all motivated by their own and the Company's financial interests.

16.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as a representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway, New York, New York 10036.

17.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CICC's address is 1 International Finance Centre 1 Harbour View Street, 29th Fl, Central Hong Kong, Special Administrative Region of the PRC.

18.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sach's address is 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong, Special Administrative Region of the PRC.

19.     The Defendants named in ¶¶ 16-18 are sometimes referred to herein as the as the "Underwriter Defendants."

20.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from FTA, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from FTA and the Individual Defendants that FTA would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)     Representatives of the Underwriter Defendants also assisted FTA and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of FTA, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with FTA's lawyers,

management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which FTA securities would be sold; (iii) the language to be used in the Registration Statement; what disclosures about FTA would be made in the Registration Statement; and (iv) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and FTA's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, FTA's existing problems as detailed herein.

(e)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

21.    Defendant Cogency Global was FTA's authorized U.S. representative for purposes of the IPO. Defendant De Vries, who signed the Registration Statement, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act.

22.    FTA, the Individual Defendants, the Underwriter Defendants, and Cogency Global are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

23.    On or about May 27, 2021, FTA filed with the SEC a Registration Statement on Form F-1, which in combination with subsequent amendments of Forms F-1/A and filed pursuant to Rule 424(b)(1), would be used for the IPO.

24.    On June 23, 2021, FTA filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, FTA sold approximately 82,500,000 ADSs at $19.00 per ADS.

25.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

26.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

27.    Rather than disclose the specific known concerns and issues with the Company's practices and apparent non-compliance with relevant technology laws, the Registration Statement merely discussed the material importance to investors of China's regulatory regime with regards to data security. The Registration Statement stated, in pertinent part, the following regarding relevant regulations:

**Regulations Related to Internet Security and Privacy Protection**

***Regulations on Internet Security***

The Decisions on Protection of Internet Security enacted by the SCNPC [Standing Committee of the National People's Congress] on December 28, 2000, as amended in August 2009, provides that, among other things, the following activities conducted through the internet, if constituted a crime according to PRC laws, are subject to criminal punishment: (i) intrusion into a strategically significant computer or system; (ii) intentionally inventing and disseminating destructive programs, such as computer viruses, to attack the computer system and the communications network, thereby destroying the computer system and the communications networks; (iii) violating national regulations, suspending the computer networks or the communication services without authorization; (iv) leaking state secrets; (v) spreading false commercial information; or (vi) infringing intellectual property rights through internet.

On December 13, 2005, the Ministry of Public Security promulgated the Provisions on Technical Measures for the Internet Security Protection, which provides that internet service providers to take proper measures including anti-virus, data back-up, keeping records of certain information such as the login-in and exit time of uses, and other related measures, and to keep records of certain information about their users for at least 60 days, and detect illegal information. According to these measures, operators that hold value-added telecommunications service license must regularly update the information security and content control systems of their websites, and shall also report any public dissemination of prohibited content to the local public security authorities.

On November 7, 2016, the SCNPC promulgated the Cybersecurity Law of PRC, or the Cybersecurity Law, effective as of June 1, 2017, which applies to the construction, operation, maintenance and use of networks as well as the supervision and administration of cybersecurity in the PRC. The Cybersecurity Law defines "network" as a system comprising computers or other information terminals and relevant facilities used for the purpose of collecting, storing, transmitting, exchanging and processing information in accordance with specific rules and procedures. "Network operators", who are broadly defined as owners and administrators of networks and network service providers, are subject to various security protection-related obligations, including: (i) complying with security protection obligations under graded system for cybersecurity protection requirements, which include formulating internal security management rules and operating instructions, appointing cybersecurity responsible personnel and their duties, adopting technical measures to prevent computer viruses, cyber-attack, cyber-intrusion and other activities endangering cybersecurity, adopting technical measures to monitor and record network operation status and cybersecurity events; (ii) formulating a emergency plan and promptly responding and handling security risks, initiating the emergency plans, taking appropriate remedial measures and reporting to regulatory authorities in the event comprising cybersecurity threats; and (iii) providing technical assistance and support to public security and national security authorities for protection of national security and criminal investigations in accordance with the law.

On June 10, 2021, the Data Security Law was promulgated by the SCNPC and will become effective on September 1, 2021. The Data Security Law mainly sets forth specific provisions regarding establishing basic systems for data security management, including hierarchical data classification management system, risk assessment system, monitoring and early warning system, and emergency disposal system. In addition, it clarifies the data security protection obligations of organizations and individuals carrying out data activities and implementing Data security protection responsibility.

### *Regulations on Privacy Protection*

Pursuant to the Decisions on Strengthening the Protection of Online information, issued by the SCNPC in 2012 and the Protection Provisions for the Personal Information of Telecommunications and Internet Users promulgated by the MIIT [the Ministry of Industry and Information Technology, formerly the Ministry of Information Industry of PRC, or the MII] in 2013, telecommunication business operators and internet service providers are required to set up their own rules for collecting and use of internet users' information and are prohibited from collecting or use such information without consent from users. Moreover, *telecommunication business operators and internet service providers shall strictly keep users' personal information confidential and shall not divulge, tamper with, damage, sell or illegally provide others with such information*.

On February 4, 2015, the Cyberspace Administration of China, or the CAC, promulgated the Provisions on the Administrative of Account Names of Internet Users, which became effective as of March 1, 2015, setting forth the authentication requirement for the real identity of internet users by requiring users to provide their real names during the registration process. In addition, these provisions specify that internet information service providers are required by these provisions to accept public supervision, and promptly remove illegal and malicious information in account names, photos, self-introductions and other registration-related information reported by the public in a timely manner.

### *Regulations on Mobile Internet Application Information Services*

On June 28, 2016, the Cyberspace Administration of PRC issued the Administrative Provisions on Mobile Internet Application Information Services, which took effect on August 1, 2016. Pursuant to which, internet information service providers who provide information services through mobile internet applications are required to authenticate the identity of the registered users, establish procedures for protection of user information, establish procedures for information content censorship and management, ensure that users are given adequate information concerning an app and are able to choose whether an App is installed and whether or not to use an installed App and its functions and keep records of users' logs for 60 days. *If an internet information service provider violates these regulations, mobile app stores through which it distributes its apps may issue warnings, suspend the release of its apps, or terminate the sale of its apps, and/or report the violations to governmental authorities.*

The Announcement of Conducting Special Supervision against the Illegal Collection and Use of Personal Information by Applications issued by three authorities including MIIT and SAMR [the State Administration for Market Regulation] on January 23, 2019, Pursuant to which, (i) application operators are prohibited from collecting any personal information irrelevant to the services

provided by such operator; (ii) information collection and usage policy should be presented in a simple and clear way, and such policy should be consented by the users voluntarily; (iii) authorization from users should not be obtained by coercing users with default or bundling clauses or making consent a condition of a service. ***App operators violating such rules can be ordered by authorities to correct its incompliance within a given period of time, be reported in public; or even suspend its operation for rectification or cancel its business license or operational permits.***

The MIIT issued the Notice on the Further Special Rectification of Apps Infringing upon Users' Personal Rights and Interests, or the Further Rectification Notice, on July 22, 2020. The Further Rectification Notice requires that certain conducts of app service providers should be inspected, including, among others, (i) collecting personal information without the user's consent, collecting or using personal information beyond the necessary scope of providing services, and forcing users to receive advertisements; (ii) requesting user's permission in a compulsory and frequent manner, or frequently launching third-parties apps; and (iii) deceiving and misleading users into downloading apps or providing personal information. ***The Further Rectification Notice also set forth that the period for the regulatory specific inspection on apps and that the MIIT will order the non-compliant entities to modify their business within five business days, or otherwise to make public announcement to remove the apps from the app stores and impose other administrative penalties.***

(Emphasis added).

28.     Rather than disclose the specific known concerns and issues with the Company's practices and apparent non-compliance with relevant technology laws, the Registration Statement merely discussed the material importance to investors of China's regulatory regime with regards to data security. The risk disclosures themselves were materially misleading because they failed to disclose the Company's non-compliance with the relevant regulations nor the potential penalties for their non-compliance—including a suspension of new user additions during a cybersecurity review. The Registration Statement stated, in pertinent part, the following regarding FTA's relevant risks:

> ***If we are unable to attract or maintain a critical mass of shippers and truckers in a cost-effective manner, whether as a result of competition or other factors,***

*our platform will become less appealing to shippers and truckers, and our financial results would be adversely impacted.*

*Our success significantly depends on our ability to maintain and increase the scale of our network by attracting additional shippers and truckers to our platform in a cost-effective manner.* If shippers choose not to use our platform, we may lack sufficient opportunities for truckers to find shipments, which may reduce the perceived utility of our platform. Similarly, if truckers choose not to offer their services through our platform, or elect to offer them through other freight matching channels, we may lack a sufficient supply of truckers to attract shippers to our platform. *An insufficient supply of shippers and truckers would adversely affect our revenue and financial results.* Although we may benefit from having larger network of shippers and truckers than our competitors, the network effects of our platform may not result in sufficient competitive advantages or may be overcome by our competitors. Maintaining a balance between shipper demand and trucker supply for any given route at any given time and our ability to execute operationally may be more important to service quality than the absolute size of the network. If our service quality diminishes or our competitors' services achieve greater market adoption, our competitors may be able to grow at a quicker rate than we do and may diminish our network effects. Additionally, if we fail to cater to the needs and preferences of shippers and truckers, control our costs in doing so or fail to deliver superior user experience, we may not be able to attract additional shippers and truckers in a cost-effective manner, and our business, financial condition and results of operations may be materially and adversely affected.

Transaction activities on our platform may decline materially or fluctuate as a result of many factors, including, among other things, dissatisfaction with the operation of our platform, the price of shipping orders, dissatisfaction with the quality of service provided by the truckers on our platform, quality of platform user support, negative publicity related to our brands, including as a result of safety incidents, or dissatisfaction with our services and offerings in general. If we fail to provide high-quality support, or introduce new or upgraded service offerings, or features that truckers, shippers, as well as ecosystem participants recognize as valuable *or if we cannot otherwise attract and retain a large number of shippers and truckers, our GTV and revenue would decline, and our business would suffer*. …

*Any decline in the number of shippers or truckers using our platform or their activity level on our platform would reduce the value of our network and would harm our future operating results.*

\*        \*        \*

*We are subject to the evolving laws and regulations governing the road transportation and internet service industries in the PRC. Heightened regulatory scrutiny may lead to frequent regulatory communications, inquiries or investigations that could materially and adversely affect our business model, results of operations and prospects.*

Our business is subject to a variety of laws and regulations in the PRC governing the rapidly evolving road transportation and internet service industries. The application and interpretation as to certain of these laws and regulations are currently ambiguous and evolving, and may be interpreted and administered inconsistently between the different government authorities and local bureaus.

*As of date of this prospectus, we have not been subject to any material fines or other penalties due to any material violations of applicable PRC laws or regulations.* However, if the PRC government continues to tighten its regulatory framework for the road transportation and internet service industries in the future, and subject industry participants such as our company to new or specific requirements, such as licensing requirements, or require us to adjust our existing business practices, our business, financial condition and prospects would be materially and adversely affected. *Recently, we, together with other industry players, were requested to attend certain regulatory guidance meetings and subsequently, furnish materials concerning our business practices in user (particularly trucker) protection, pricing, competition and other aspects to the relevant regulators for their review.* Going forward, we may continue to be required to attend similar meetings or become subject to regulatory inquiries or investigations with PRC regulators. There is no guarantee that such regulatory communications would not result in substantial penalties or orders that require us to adjust our existing business practices in ways that may materially and adversely affect our growth and results of operations. *Compliance with existing and future rules, laws and regulations can be costly and if our practices are deemed to violate any existing or future rules, laws and regulations, we may face injunctions, including orders to cease non-compliant activities, and may be exposed to other penalties as determined by the relevant government authorities as well.* We may also suffer reputational damages, if we or our business partners are deemed to violate any existing or future rules, laws and regulations.

… If any of the content posted or displayed on our platform is deemed by the PRC government or any international regulatory authority to violate any content restrictions, we could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations.

… Failure by us or our business partners to comply with any such new regulatory or licensing requirements could materially and adversely affect our business and results of operations.

\*        \*        \*

***Our business generates, collects, stores and processes a large amount of data, which include sensitive personal information. The improper collection, use or disclosure of such data by us or our employees could materially and adversely affect our reputation, business, results of operations and financial condition.***

We face risks inherent in handling and protecting a large amount of data that our business generates and processes from the significant number of transactions our platform facilitates, and such data include sensitive personal information. In particular, we face a number of challenges relating to data from transactions and other activities on our platform, including:

- protecting the data in and hosted on our system, including against attacks on our system by external parties or misbehavior by our employees;
- addressing concerns related to privacy, security and other factors; and
- complying with applicable laws, rules and regulations relating to the collection, storage, use, transfer, disclosure and security of personal information, including any requests from regulatory and government authorities relating to such data.

***In particular, if we fail to secure our users' identity and protect their identity-specific data, such as their addresses and contact information, our users may be vulnerable to harassments, and their assets may also be put at risk due to data leakages.*** As a result, we may be held liable for these incidents, and our users may feel insecure and cease to use our services. In addition, any system or technological failure or compromise of our technology system that results in unauthorized access to or release of any personal data of our users or proprietary information of our business operations could significantly harm our reputation and/or result in litigation, regulatory investigations and penalties against us.

We are subject to various data privacy and protections laws and regulations in China, including without limitation, the PRC Cybersecurity Law. Under the Cyber Security Law of China, the owners and administrators of networks and network service providers have various personal information security protection obligations, including restrictions on the collection and use of personal information of users, and they are required to take steps to prevent personal data from being divulged, stolen, or tampered with. See "Regulation—Regulations Related to Internet Security and Privacy Protection" for details. Moreover, different regulatory bodies in China, including the Ministry of Industry and

Information Technology, or the MIIT, the Cyberspace Administration of China, or CAC, the Ministry of Public Security and the SAMR, have enforced data privacy and protections laws and regulations with various standards and applications. These various standards in enforcing data privacy and protection laws may create difficulties in ensuring full compliance and increase our operating cost, as we need to spend time and resources to deal with various inspections for compliance.

***While we have adopted a rigorous and comprehensive policy for the collection, processing, storage and other aspects of data use and privacy and taken necessary measures to comply with all applicable data privacy and protection laws and regulations***, we cannot guarantee the effectiveness of these policies and measures undertaken by us, or business partners on our platform. ***In the past, we received notices from regulatory authorities that identified certain compliance defects in our data privacy and protections practices, requiring us to rectify our data privacy measures, without imposing any penalty on us.*** We have adopted several remedial measures in response to such notices and submitted our rectification reports to the relevant governmental authorities. Despite the absence of any material cybersecurity breach and our continuous efforts to comply with our internal policies as well as applicable laws and regulations, any failure or perceived failure to comply with all applicable data privacy and protection laws and regulations, any failure or perceived failure of our business partners to do so, or any failure or perceived failure of our employees to comply with our internal control measures, may result in negative publicity and legal proceedings or regulatory actions against us, and could result in fines, revocation of licenses, suspension of business operations or other penalties or liabilities, which may in turn damage our reputation, discourage current and potential shippers and truckers from using our services, and subject us to fines and damages, which could have a material adverse effect on our business and results of operations.

Furthermore, the PRC regulatory and enforcement regime with regard to data security and data protection is still evolving. PRC regulators have been increasingly focused on regulation in the areas of data security and data protection. For example, in October 2020, the Standing Committee of the National People's Congress of China released a draft personal information protection law, or the Draft PI Protection Law, for public comment. The Draft PI Protection Law provides for various requirements on personal information protection, including legal bases for data collection and processing, requirements on data localization and cross-border data transfer, requirements for consent and requirements on processing of sensitive personal information. As the Draft PI Protection Law remain subject to change, we may be required to make further adjustments to our business practices to comply with the enacted form of the law. Furthermore, we cannot assure you that relevant regulators will not interpret or implement the laws or regulations in ways that negatively affect us. In addition, it is possible that we may become subject to additional or new laws and regulations in this regard, which may result in additional expenses to us and subject us to

14

potential liability and risk of negative publicity. We expect that data security and protection will continue to receive significant public attention and scrutiny from regulators going forward, which could increase our compliance costs and subject us to heightened risks and challenges associated with data security and protection. If we are unable to manage these risks, we could become subject to penalties, fines, suspension of business and revocation of required licenses, and our reputation and results of operations could be materially and adversely affected.

*    *    *

***Our business depends upon the interoperability of our platform across devices, operating systems, and third-party applications that we do not control.***

One of the most important features of our platform is its broad interoperability with a range of devices, operating systems, and third-party applications. Our platform is accessible from devices running various operating systems such as iOS and Android and the web portals for personal computers. ***We depend on the accessibility of our platform across these third-party operating systems and applications that we do not control.*** Moreover, third-party services and products are constantly evolving, and we may not be able to modify our platform to assure its compatibility with that of relevant third parties following development changes. The loss of interoperability, whether due to actions of third parties or otherwise, could adversely affect our business.

*    *    *

***We are dependent on app stores to distribute our mobile apps.***

***We currently cooperate with Apple's app store and Android app stores to distribute our mobile apps to users.*** As such, the promotion, distribution and operation of our applications are subject to such distribution platforms' standard terms and policies for application developers, which are subject to the interpretation of, and frequent changes by, these distribution channels. If these third-party distribution platforms change their terms and conditions in a manner that is detrimental to us, or refuse to distribute our applications, or if any other major distribution channel with which we would like to seek collaboration refuses to collaborate with us in the future on commercially favorable terms, our business, financial condition and results of operations may be materially and adversely affected.

(Emphasis added.)

29.     The statements referenced in ¶¶ 27-28 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to

15

Defendants or recklessly disregarded by them. Specifically, the Registration Statement contained false and/or misleading statements and/or failed to disclose that: (1) FTA's apps *Yunmanman* and *Huochebang* would face an imminent cybersecurity review by the CAC; (2) the CAC would require FTA to suspend new user registration; (3) FTA needed to conduct a "comprehensive self-examination of any cybersecurity risks"; (4) FTA needed to "continue to improve its cybersecurity systems and technology capabilities"; and (5) as a result, Defendants' public statements were materially false and misleading at all relevant times and negligently prepared.

30.    Then on July 5, 2021, the Company issued a press release entitled "Full Truck Alliance Announces Cybersecurity Review in China" which announced, in pertinent part, that:

> … pursuant to an announcement issued by the Cybersecurity Review Office ("CRO") of the Cyberspace Administration of China on July 5, 2021, ***CRO has initiated a cybersecurity review of FTA's Yunmanman apps and Huochebang apps. In order to facilitate the review and prevent the expansion of potential risks, these mobile apps are required to suspend new user registration in China during the review period.***
>
> FTA will fully cooperate with CRO during the cybersecurity review process. ***FTA is conducting a comprehensive self-examination of any potential cybersecurity risks and will continue to improve its cybersecurity systems and technology capabilities.*** FTA hopes its full cooperation will assist CRO to complete its review process smoothly.
>
> (Emphasis added.)

31.    On this news, FTA ADSs fell $1.27 per ADS, or over 6%, to close at $17.75 per ADS on July 6, 2021, the next trading day, damaging investors.

32.    Since the IPO, and as a result of the disclosure of material adverse facts omitted from FTA's Registration Statement, FTA's stock price has fallen below its IPO price, damaging Plaintiff and Class members.

33.    Additionally, due to the materially deficient Registration Statement, Defendants

have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

34.    SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the Offering risky or speculative and that each risk factor adequately described the risk. Defendants' failure to disclose the already occurring significant problems underlying its base business, as well as the likely material effects it would have on the Company's ADS price, rendered the Registration Statement's many references to known risks that "if" occurring "may" or "could" adversely affect the Company as false and misleading.

35.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action on behalf of all those who purchased FTA securities pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by FTA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violations of Section 11 of the Securities Act Against All Defendants

42.    Plaintiff incorporates all the foregoing by reference.

43.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

44.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

45.    Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

46.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

47.    By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

48.    Plaintiff acquired FTA securities pursuant to the Registration Statement.

49.    At the time of their purchases of FTA securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

50.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II
## Violations of Section 12(a)(2) of the Securities Act Against All Defendants

51.     Plaintiff incorporates all the foregoing by reference.

52.     By means of the defective Prospectus, Defendants promoted, solicited, and sold the Company's securities to Plaintiff and other members of the Class.

53.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased FTA securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

54.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired FTA securities.

55.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased FTA securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the securities. Accordingly,

Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their securities, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

56.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

### COUNT III
### Violations of Section 15 of the Securities Act Against the Individual Defendants

57.    Plaintiff incorporates all the foregoing by reference.

58.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

59.     The Individual Defendants were controlling persons of FTA by virtue of their positions as directors or senior officers of FTA. The Individual Defendants each had a series  of direct and indirect business and personal relationships with other directors and officers and major shareholders of FTA. The Company controlled the Individual Defendants and all of FTA's employees.

60.    FTA and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

61.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the

exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

A.    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.    awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: July 12, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/Phillip Kim*
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiff*