UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRATYUSH KOHLI, Individually and On Behalf of All Others Similarly Situated, | Case No. 1:21-cv-03903-LDH-MMH |
| Plaintiff, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| FULL TRUCK ALLIANCE CO. LTD., PETER HUI ZHANG, SIMON CHONG CAI, SHANSHAN GUO, GUIZHEN MA, WENJIAN DAI, RICHARD WEIDONG JI, JENNIFER XINZHE LI, COLLEEN A. DE VRIES, COGENCY GLOBAL, INC., MORGAN STANLEY & CO. LLC, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, GOLDMAN SACHS (ASIA) L.L.C., UBS SECURITIES LLC, HUATAI SECURITIES (USA), INC., CITIGROUP GLOBAL MARKETS INC., NOMURA SECURITIES INTERNATIONAL, INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, AND CLSA LIMITED, | JURY TRIAL DEMANDED CLASS ACTION |
| Defendants. | |

Lead Plaintiff Pratyush Kohli ("Kohli") and named plaintiff Shivtaj Zirvi (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their amended complaint against Defendants Full Truck Alliance Co. Ltd. ("FTA" or the "Company"), Peter Hui Zhang, Simon Chong Cai, Shanshan Guo, Guizhen Ma, Wenjian Dai, Richard Weidong Ji, Jennifer Xinzhe Li, Colleen A. De Vries, Cogency Global, Inc., Morgan Stanley & Co. LLC, China International Capital Corporation Hong Kong Securities Limited, Goldman Sachs (Asia) L.L.C., UBS Securities LLC, Huatai Securities (USA), Inc., Citigroup Global Markets Inc., Nomura Securities International, Inc., China Renaissance Securities (Hong

1

Kong) Limited, and CLSA Limited ("Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation it conducted by and through her attorneys, which included, among other things, a review and analysis of: (i) FTA's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) FTA's public filings with Chinese regulatory agencies and its local provincial offices; (iii) public reports and news articles; (iv) transcripts of FTA's conference calls; (v) interviews with witnesses with relevant information; and (vi) other publicly-available material and data identified herein. Plaintiffs' investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Full Truck Alliance Co. Ltd. ("FTA" or the "Company") American Depositary Shares ("ADSs")[1] from June 22, 2021 to July 2, 2021, inclusive (the "Class", and the period from June 22, 2021 to July 2, 2021 is the "Class Period").  Plaintiffs bring the following claims on behalf of the Class: (1) Sections 11 and 15 claims under the Securities Act of 1933 (the "Securities Act") for all purchasers of FTA ADSs pursuant or traceable to the Registration Statement and Prospectus in connection with FTA's initial public offering (collectively the "Registration Statement") held on or about June 22, 2022 (the "IPO" or "Offering"); and (2) Sections 10(b) and 20(a) claims under the Securities Exchange Act of 1934 (the "Exchange Act") for all purchasers of FTA ADSs during the Class Period.

---

[1] American Depositary Shares, also known as ADSs, are U.S. dollar-denominated shares of stock of a foreign-based company available for purchase on an American stock exchange. ADSs are issued by depository banks in the U.S. under agreement with the issuing foreign company.

2

2.      FTA, dubbed as China's "Uber for trucks", is the world's largest digital freight platform. Through two apps Yunmanman and Huochebang, FTA connects people seeking truckers to transport their freights with truckers providing such commercial transportation services. FTA operates its business in China. FTA through its two apps have amassed over ten years' worth electronic data and information regarding people, enterprises, roadways and logistics in China and is a critical information infrastructure operator under the Chinese law.

3.      On June 22, 2021, FTA conducted an IPO on the New York Stock Exchange ("NYSE").  FTA sold 82.5 million ADSs at $19/ADS pursuant to its Registration Statement.

4.      FTA conducted its IPO at a time when China was ramping up its regulatory enforcement on Chinese "platform" companies or internet companies that provide services through proprietary apps or websites – such as FTA – to ensure such platform companies protect their data from violating China cybersecurity laws and China's national security interests. On March 15, 2021, three months before FTA's IPO, Xi Jinping, President of China, ordered the Cyberspace Administration of China ("CAC") and other regulators to "step up" scrutiny of "internet platform companies" and demanded that platform companies to, among other things, "enhance data security." The next day, an article in *Fortune* observed that Xi's order is a sign that the months-long crackdown on the China' internet sector was only just beginning.

5.      The CAC is the primary regulatory agency of the Chinese central government for regulating cybersecurity and to ensure the safeguarding of personal information. The CAC directly reports to President Xi and has broad powers to regulate the activities of internet/app-related businesses – like FTA. This includes, among other things, the power to close businesses, shut down or suspend websites and apps, and to prohibit a business from taking on customers if the CAC believes the business is violating laws and/or regulations concerning national security,

cybersecurity, data security, and/or personal privacy.  Because the CAC has wide discretion to mete out these punishments, it is a powerful regulatory body and well known to FTA and other tech businesses in China.

6.      As part of its road map for enhancing data security, China published the final drafts of two new data security laws – Data Security Law and Personal and Personal Information Protection Law – in April 2021, signaling China's resolve to prohibit unintended leakage of important personal data outside of China.  These two new laws, set to become effective in late 2021, would present a nearly insurmountable barrier for China-based tech companies (such as FTA) seeking to list and trade on U.S. exchanges because China would not allow companies that China viewed lacked proper data security to be subject to the laws of foreign jurisdictions, *i.e.* list their securities on a foreign exchange.

7.      To avoid the grim prospect created by the Data Security Law and Personal and Personal Information Protection Law, FTA rushed its IPO before the two laws became effective to cash in and raise over $1.56 billion in its IPO.

8.      In its Registration Statement, FTA vaguely disclosed that before the IPO, the Company "attend[ed] certain regulatory guidance meetings" and was directed to have submitted materials to the relevant regulators for their review. FTA did not disclose, however, that on May 14, 2021, one month before the IPO, top Chinese regulatory authorities, including the CAC, held a meeting with FTA identifying a spate of misconduct damaging truckers' rights. At the meeting, Chinese regulatory authorities expressly demanded, among other things, that FTA (and other attendee app operators) "heighten the protection of users' personal information" on their apps. The Chinese authorities ordered FTA to correct their misconduct and publish their rectification results to the public. Significantly, FTA did not disclose in the Registration Statement that it did not take

any measures, or plan to take any measures, to heighten user data protection. Indeed, nothing regarding the protection of personal information of its users was set forth in FTA's to do list and materials submitted to the Chinese authorities.

9.     FTA's failure to adequately address its user personal information concerns raised at the May 14, 2021 meeting, created an imminent and known heightened risk at the time of the IPO that the regulatory authorities would find FTA's submission in response to be insufficient as to data protection and cybersecurity. As such, FTA was subject to a present and imminent risk of regulatory penalties. None of these risks, which existed at the time of the IPO, were disclosed in the Registration Statement – rendering it materially false.

10.     These risks quickly materialized, damaging Plaintiffs and the Class.

11.     On July 5, 2021, the CAC announced that it had launched a cybersecurity review of FTA's two apps Yunmanman and Huochebang and suspended the two apps' new user registration "in order to accommodate cybersecurity review and prevent the expansion of risks." On the same day, FTA disclosed the CAC's announcement.

12.     On this news, FTA's ADS price fell $3.89/ADS to $15.13/ADSA from July 6, 2021 and July 8, 2021 – wiping out $4 billion in market capitalization. By the commencement of this action, FTA's ADSs fallen 17% from its IPO price damaging Plaintiffs and the Class.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because the alleged misstatements entered and the subsequent damages took place in this judicial district.

16.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## **PARTIES**

17.      Plaintiff Kohli purchased FTA ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein. (Dkt. No. 9-2.)

18.     Named Plaintiff Shivtaj Zirvi purchased FTA ADS pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. Its PSLRA certification has been previously filed with the Court and is incorporated by reference herein. (Dkt. No. 7-1.)

19.     Defendant FTA purports to, with its subsidiaries, operate a digital freight platform that connects shippers with truckers to facilitate shipments in China. It offers freight listing, matching, and brokerage services; and online transaction services, as well as various value-added services. Yunmanman and Huochebang were founded in 2013 and 2011, respectively, and both

6

companies were digital freight platforms in China prior to their merger which created FTA in 2017.The Company is incorporated in the Cayman Islands and its principal executive offices are located at No. 123 Kaifa Avenue, Economic and Technical Development Zone, Guiyang, Guizhou 550009, People's Republic of China ("PRC") and Wanbo Science and Technology Park, 20 Fengxin Road, Yuhuatai District, Nanjing, Jiangsu 210012, PRC. FTA securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "YMM."

20.     Defendant Peter Hui Zhang ("Zhang") is the founder of FTA and has served as the Chairman of the Board of Directors since November 2020 and Chief Executive Officer since December 2018. Zhang reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

21.      Defendant Simon Chong Cai ("Cai") was at the time of the IPO the Company's Chief Financial Officer. Cai reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

22.     Defendant Shanshan Guo ("Guo") served as an FTA director at the time of the IPO. Guo reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

23.     Defendant Guizhen Ma ("Ma") served as an FTA director at the time of the IPO. Ma reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

24.     Defendant Wenjian Dai ("Dai") served as an FTA director at the time of the IPO. Dai reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

25.    Defendant Richard Weidong Ji ("Ji") served as an FTA director at the time of the IPO. Ji reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

26.    Defendant Jennifer Xinzhe Li ("Li") served as an FTA director at the time of the IPO. Li reviewed and signed, or authorized the signing, of the Registration Statement in connection with the IPO prior to the Effective Date.

27.    Defendants Zhang, Cai, Guo, Ma, Dai, Ji and Li are sometimes referred to herein collectively as the "Individual Defendants."

28.    Defendants FTA and Individual Defendants are sometimes referred to herein collectively as the "FTA Defendants."

29.    FTA, Zhang and Cai are sometimes referred to herein collectively as the "Exchange Act Defendants."

30.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

31.    Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

32.    Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and

dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

33.    Defendant UBS Securities LLC is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

34.    Defendant Huatai Securities (USA), Inc. is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

35.    Defendant Citigroup Global Markets Inc. is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

36.    Defendant Nomura Securities International, Inc. is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

37.    Defendant China Renaissance Securities (Hong Kong) Limited is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

38.    Defendant CLSA Limited is an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Registration Statement.

39.     The Defendants named in ¶¶ 30-38 are sometimes referred to herein as the "Underwriter Defendants." Defendants Morgan Stanley, CICC and Goldman Sachs acted as the representatives of all the Underwriter Defendants ("Lead Underwriters").

40.     Defendant Colleen A. De Vries ("De Vries") was at the time of the IPO FTA's duly authorized representative in the United States. Defendant De Vries reviewed, contributed to, and signed the false and misleading Registration Statement on her own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant De Vries' employer.

41.     Defendant Cogency Global Inc. ("Cogency Global") was FTA's authorized U.S. representative for purposes of the IPO. Defendant De Vries, who signed the Registration Statement, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act.

42.     FTA, the Individual Defendants, the Underwriter Defendants, De Vries and Cogency Global are referred to collectively as "Defendants."

## <u>SECURITIES ACT CLAIMS[2]</u>

**BACKGROUND**

**I.  FTA Possesses Enormous Amount of Key Data of Private Individual and Business Information.**

43.     FTA is a road logistics company in China and operates a digital freight platform. It purportedly is the world's largest of its kind by gross transaction value ("GTV"). On FTA's platform, shippers who seek to hire third party trucking service providers to transport freights via

---

[2] Plaintiffs specifically disclaim any allegation of fraud, recklessness or intentional misconduct concerning allegations under Securities Act.

road in China are matched with truckers who provide such trucking services. FTA derives its revenue from several channels, such as selling shippers memberships, charging truckers commissions, providing brokerage services between shippers and truckers and value add services.

44.    FTA's platform comprises two applications ("apps"), "Yunmanman" and "Huochebang", which initially were owned and operated by two competing companies. In 2017, the two companies merged into FTA in 2017, establishing a nationwide road logistics network with significant economies of scale. As Defendants describe it in the Registration Statement, FTA "ha[s] transformed China's road transportation industry by pioneering a digital, standardized and smart logistics infrastructure across the value chain."

45.    Combined with its predecessors' years of operations, FTA has had over 10 years of experience in the trucking industry and established a nationwide trucking service network spanning over 300 cities and over 100,000 routes in China. In 2020, FTA facilitated 71.7 million fulfilled orders with GTV of RMB173.8 billion (US$26.6 billion), which accounted for 64% of the total GTV achieved on all Chinese digital freight platforms combined in that year. In 2020, over 2.8 million truckers fulfilled shipping orders on the FTA platform and approximately 20% of all China's heavy-duty and medium-duty truckers fulfilled shipping orders on the FTA platform. As a result of its leading role in the trucking services for many years, FTA has accumulated over 80% of the data in the road logistics industry in China. The data that FTA possesses include private individual information, demographics and population migration, nationwide roadway statistics and layouts, nationwide logistic statistics, geographical distribution of China's commerce and industries, merchandise movements across China and their types, and enterprises' business and financial data, which essentially gives a bird's eye view of entire China's demographics and

economic condition. Under Chinese law, it is an operator of critical information infrastructure and subject to the Chinese government's heightened cybersecurity scrutiny and protection.

46.     On or about May 27, 2021, FTA filed with the SEC a Registration Statement on Form F-1, which in combination with subsequent amendments of Forms F-1/A and filed pursuant to Rule 424(b)(1), would be used for the IPO.

47.     On June 23, 2021, FTA filed with the SEC its final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement. In the IPO, FTA sold approximately 82.5 million ADSs at $19.00 per ADS.

## II.  The CAC Is A Powerful Agency Directly Supervised by the President of China

48.     China connected to the internet in 1994. Since then, the number of Chinese citizens who use internet and phone apps has grown exponentially. In 2018 alone, China generated 7.6 zettabytes[3] of data, as compared to 6.9 ZB of data generated by the U.S. in the same year. Data usage in China is expected to grow to 48.6 ZB in 2025.

49.     Recognizing the increasing significance of internet content and data security to China, China formed the CAC in May 2011 to tighten its grip over cybersecurity and regulate and control internet content and data in China. In 2014, the Central Committee of the Communist Party of China ("CPC"), China's sole ruling party, formed the Central Cyberspace Affairs Commission (formerly known as the Cyberspace Affairs Leading Group, "CCAC") to directly lead the CAC. The Director of CCAC is Xi Jinping—CPC General Secretary and President of China. The Office of CCAC, the daily operating administrative agency of CCAC, shares the same leadership team, working staff and workplace with the CAC, i.e., they are the same agency under the direct

---

[3] A zettabyte ("ZB") is equal to a trillion gigabytes or $10^{21}$ (1,000,000,000,000,000,000,000) bytes.

12

leadership of CCAC.[4] Xi directed that the CCAC should "coordinate major cybersecurity and informatization issues in various fields, formulate and implement national cybersecurity and informatization development strategies, macro plans, and major policies, and continuously enhance security assurance capabilities."[5]

50.     Since President Xi came into reign, he has consistently stressed the need to protect cybersecurity and private personal data as a critical part of his national security rules.

51.     On April 19, 2016, presiding over a Cybersecurity and Informatization Work Symposium, President Xi expressed his fundamental philosophy on cybersecurity and data. Xi described information technology as China's biggest "gate of life".[6] As such, China "needs to keep control over its internet development and keep the internet and the nation safe."[7] Xi also demanded active scrutiny of existing cybersecurity to identify and eliminate risks.

52.     At an October 9, 2016, CPC Politburo Standing Committee[8] conference discussing China's cyber strategies, President Xi urged China to "strengthen the protection of critical

---

[4] One governmental agency having two names is a unique mechanism designed by the CPC to hide its ultimate control over such agency from other countries. One name is used when dealing with other countries on international matters to make such agency appear as a normal administrative agency, such as in here the CAC. The other name, such as in here the CCAC Office, is used by the CPC in China to show the CPC's authorities and propagate communist agenda. Other examples are the State Council Information Office (internally known as the Propaganda Department of the CPC Central Committee), and the Taiwan Affairs Office of the State Council (internally known as the Taiwan Work Office of the CPC Central Committee).

[5] http://www.cac.gov.cn/2016-02/29/c_1118191115.htm, last viewed on September 13, 2022.

[6] In traditional Chinese medicine, this refers to a spot on the lower back that holds the Yin and Yang, the origin from which all substances and functions develop. The "gate of life" has come to refer to the most fundamental part of a policy, as well as its enforcement, operations, and survival.

[7] http://www.xinhuanet.com/zgjx/2016-04/26/c_135312437.htm, last viewed on September 13, 2022.

[8] The CPC Politburo Standing Committee is a committee consisting of CPC's top leadership. Historically it has been composed of five to eleven members, and currently has seven members. Because China is a one-party state, the CPC Politburo Standing Committee's decisions *de facto* have the force of law. Its membership is closely watched by both the national media as well as political watchers abroad.

information infrastructure" and "keep cyberspace secure and cyber data intact, secure and reliable, and improve our ability to safeguard cyberspace security."[9]

53.    During Cybersecurity Week in September 2019, President Xi pledged to "safeguard the security of personal information and citizens' legal rights and interests in cyberspace." [10]

54.    The enactment of the Holding Foreign Companies Accountable Act ("HFCAA") by the U.S. Congress in December 2020 – a law targeting Chinese companies trading on the U.S. exchanges failing to subject their work papers underlying financial statements to the U.S. inspection – was particularly nerve racking to China and Xi. In China' view, the U.S. was forcing Chinese companies to surrender confidential information, *e.g.*, critical business and industrial information and user data, that China regards as its own state property. On March 15, 2021, chairing a meeting of the CPC's top financial advisory and coordination committee, in "unusually strongly worded comments," Xi ordered regulators to "step up" oversight of internet platform companies.[11] He specifically demanded that platform companies to, among other things, "enhance data security." The next day, an article in *Fortune* observed that Xi's orders issued at the meeting were a sign that the months-long crackdown on the China' internet sector was only just beginning.

---

[9] http://cpc.people.com.cn/n1/2016/1010/c64094-28763907.html, last viewed on September 13, 2022.

[10] http://politics.people.com.cn/n1/2019/0916/c1024-31355600.html, last viewed on September 13, 2022.

[11] ttps://fortune.com/2021/03/16/china-xi-jinping-platform-companies-tech-internet-crackdown/, last viewed on September 13, 2022.

**III. To Carry Out President Xi's Directives, Chinese Congress and The CAC Have Passed a Series of Laws and Regulations to Protect Cybersecurity and Private Personal Data**

55.    Over the past ten years, corresponding to President Xi's increasing level of concern over cybersecurity and private personal data, China has passed a series of laws and regulations pertaining to cybersecurity and data protection. The following laws and regulations relating to cybersecurity and personal data are particularly relevant to FTA's business operations.

56.    On December 28, 2012, the Standing Committee of the National People's Congress of China published a Decision on Strengthening Information Protection on Networks ("Congress Decision"), which first established network service providers' duties to keep personal digital information confidential and safe and barred providers from leaking or illegally providing personal information to a third party. Violations of the Congress Decision are punishable by monetary fines, revocation of business licenses, and/or the closure of websites held in violation.

57.    On February 4, 2015, the CAC, promulgated the Provisions on the Administrative of Account Names of Internet Users, which became effective as of March 1, 2015, setting forth the authentication requirement for the real identity of internet users and protection of users' personal information.

58.    On June 28, 2016, the CAC promulgated the Provisions on the Administration of Mobile Internet Applications Information Services (the "App Provisions"), pursuant to the Congress Decision and the State Council Authorization. Under the App Provisions, the app information service providers shall implement the information security management responsibilities strictly and fulfill their obligations, including protection of users' information.

59.    The Cybersecurity Law, effective June 1, 2017, protects national security and

public interests, including the safety of personal information. It prohibits the collections of unnecessary information and requires notice and informed consent from persons whose data is collected to limit the cybersecurity risks posed by the collection, storage, and use of vast amounts of private, personal information not essential to the provision of services. Cybersecurity Law also imposes additional duties on companies that operate critical information infrastructures[12] to safeguard personal information and national security. The Cybersecurity Law provides penalties of increasing severity that a regulatory authority can impose, individually or collectively, including the provision of warnings, ordering of corrective measures, confiscation of unlawful gains, levying of fines against businesses and supervisory personnel, suspension of a business or its operations pending correction, closing down of websites, and the revocation of permits and business licenses.[13] Entities that gather or produce personal or other sensitive data – such as FTA – are required to adhere to strict cybersecurity requirements, including "conduct[ing] a security assessment if business necessities require such information to be provided outside of China" and

---

[12] In accordance with the Cybersecurity Law, critical information infrastructure refers to information infrastructure in important industries and sectors such as public communications, information service, energy, transport, water conservancy, finance, public service and e-government, and other critical information infrastructure that, once damaged, disabled or data disclosed, may severely threaten China's national security, national economy, Chinese people's livelihood and Chinese public interests.

[13] For example, Article 64 of Cybersecurity Law provides that when a network operator or network services provider, such as FTA, infringes upon any right in personal information, a regulatory authority, such as the CAC,

> "shall order such operator or provider to make rectification and such operator or provider may be subject to ***one or combination of the following actions***, depending on the severity of the circumstance: warning, confiscation of illegal earnings, a fine equal to the illegal earnings up to 10 times the illegal earnings, or a fine less than 1million yuan and the supervisor directly in charge and other directly liable persons subject to a fine ranging from 10,000 yuan to 100,000 yuan if there is no illegal earnings. In case of any severe violation, the competent authority may order suspension of related business, business close-down pending rectification, website shutdown , and revocation of relevant operation permit or business license."

to "conduct self-inspections, at least annually, and submit a cybersecurity report of the findings as well as improvement measures to regulators." (Cybersecurity Law Arts. 37, 38). Significantly, the CAC is authorized to directly inspect critical information infrastructure operators such as FTA.

60.    On January 23, 2019, the CAC, together with another two ministries, published the Announcement of Conducting Special Supervision against the Illegal Collection and Use of Personal Information by Applications, which prohibits illegal and unnecessary collection of personal information and other violations of personal data privacy. Under the Announcement, an offending app operator faces severe punishments such as  operation suspension pending rectification or revocation of its business license or operational permits.

61.    To implement the Cybersecurity Law, on April 27, 2020, the CAC, together with another 10 ministries, published the Measures of Cybersecurity Review (the "CSR Measures"). The CSR Measures outline the process by which the CAC safeguards cybersecurity. According to the CSR Measures, the CAC will launch a cybersecurity review when it deems necessary.

62.    On March 12, 2021, four agencies, including the CAC, jointly promulgated the "Provisions on the Scope of Necessary Information for Common Types of Common Mobile Internet Applications" ("Provisions on Necessary Information"). The preamble and Article 1 of the regulations indicate that they were written to implement Article 41 of the Cybersecurity Law, prohibiting the collection of more information from a user than is necessary to provide the service.[14] Article 5 of the regulation sets forth 39 different service categories of apps and, for each, sets forth the type of information deemed necessary to provide the service. A provider who requests

---

[14] http://www.cac.gov.cn/2021-03/22/c_1617990997054277.htm, last viewed on September 13, 2022.

information unnecessary to the provision of its service can be reported to the agencies for enforcement. The Provisions on Necessary Information took effect May 1, 2021.

63.    On June 10, 2021, China enacted the Data Security Law. The first draft of this law was released in July 2020; the second draft was released on April 29, 2021. Law firms updated clients on important comparisons between the first two drafts.[15] One firm noted that the second draft of the law included a provision that "stipulates that where a foreign judicial or law enforcement organ requests for data that is 'stored' within China, such data shall not be provided unless China's 'competent government agency' has approved such a provision (Article 35)."[16] As explained above, this new requirement, ultimately enacted as Data Security Law Article 36 effective September 1, 2021, could present a formidable roadblock for China-based companies seeking to list and trade on U.S. exchanges. Because regulations have not yet been adopted setting forth the bases for approving or rejecting such a request, a company could not be certain whether requested documentation, including but not limited to work papers required for the U.S's inspection, would be allowed to leave China. More generally, Article 31 mandates that all cross-border data transfers by critical information infrastructure operators comply with the Cybersecurity Law and that cross-border transfers of other important data must comply with the CAC rules. Pursuant to Article 45, violations can result in fines, business suspension, license revocation, business closure, and, for violations by critical information infrastructure operators

---

[15]    *See* https://www.huntonprivacyblog.com/2021/05/03/china-issues-the-second-version-of-the-draft-of-data-security-law/#more-20445, last viewed on September 13, 2022.
[16]    "China Released Updated Draft Data Security Law and Personal Information Protection Law for Public Comments," Covington (May 3, 2021) (https://www.cov.com/en/news-and-insights/insights/2021/05/china-released-updated-draft-data-security-law-and-personal-information-protection-law-for-public-comments), last viewed on September 13, 2022.

that endanger national security, criminal penalties. Moreover, under Article 24, national security reviews of data processing activities under the state's review system are final and not appealable.

64.     On August 22, 2021, China enacted the first comprehensive law concerning personal information protection in China – Personal Information Protection Law, which was set to come into effect on November 1, 2021. Draft versions were released on October 21, 2020, and April 29, 2021. The law applies to both personal information and sensitive personal information (the disclosure of which would impinge on one's dignity or cause harm) and sets stringent standards for personal information processors' collection, use and handling of such information. Working in conjunction with the Cybersecurity Law and Data Security Law, critical information infrastructure operators and other processors of large amounts of personal information cannot export such data without either passing a security assessment, being certified to do so, entering into a standard contract (drafted by the CAC) binding the recipient to comply with the Personal Information Protection Law, or as otherwise permitted.

## IV. The CAC Has the Power to Immediately Impose Material Penalties If It Finds A Violation.

65.     To centralize regulation and enforcement, upon the formation of the CAC in 2011, the State Council, China's chief administrative authority, authorized the CAC "to manage internet content in China and be in charge of supervising and managing the law enforcement in this regard to ensure the healthy and orderly development of internet information services, protect Chinese people's … rights and maintain national security…".[17]

66.     Authorized by Chinese law and regulations, the CAC has the expansive power immediately to impose severe penalties if it determines that a business is violating any

---

[17] http://www.cac.gov.cn/2014-08/28/c_1112264158.htm, last viewed on September 13, 2022.

cybersecurity-related law or implementing regulation without permitting the business an opportunity to challenge the CAC's determinations. For example, the Cybersecurity Law authorizes the CAC instantaneously to impose, upon its finding of any violation, a combination of severe penalties, including, *inter alia*, fines up to 10 times, business suspension, business close-down pending rectification, website shutdown, and revocation of business licenses and permits.

67.     Historically, violations of the cybersecurity laws and regulations have resulted in serious sanctions levied against many thousands of persons and businesses. Each year, the CAC publishes an annual summary report of enforcement actions it took in that year against internet and app companies whose practices were found illegal by the CAC, alerting the Chinese society to the severe consequences if the CAC finds any violation. According to these reports, from 2015 to 2017, the CAC summoned more than 2,200 website operators for administrative meetings, shut down over 13,000 websites, and closed nearly 10 million user accounts "that had violated relevant laws and regulations."1[18] In 2019 and 2020, enforcement actions rose significantly: the number of operators summoned by the CAC for administrative meetings increased from 2,767 in 2019 to 4,282 in 2020; warnings were issued to 2,174 websites (2019); 384 websites were suspended in 2019, sharply increasing to 1,994 in 2020; and the CAC shut down 11,767 websites in 2019 and a whopping 18,489 in 2020 because they had "violated laws."[19] These reports also show that the

---

[18]https://www.scmp.com/news/china/policies-politics/article/2125592/china-shuts-down-over-13000-websites-past-three-years, last reviewed on September 13, 2022.; http://news.sina.com.cn/o/2017-12-24/doc-ifypxmsr0036708.shtml, last reviewed on September 13, 2022.

[19]http://www.cac.gov.cn/2020-02/18/c_1583568767032468.htm (2019), last reviewed on September 13, 2022;
https://news.cctv.com/2021/01/30/ARTIbZW8p6fmvDhDnz6tbu8c210130.shtml (2020), last reviewed on September 13, 2022.
http://www.cac.gov.cn/2022-01/27/c_1644887128880847.htm (2021), last reviewed on September 13, 2022.

CAC shut down or suspended a company's entire business even though only a part of a company's business was found violating laws and regulations.

68.    Chinese major media widely report the CAC's annual summary report each time CAC releases it on its website. The Chinese society, from enterprises to people from all walks of life, understand the massive power of the CAC possesses and the severe adverse consequences of disobeying the CAC.

## V.    Immediately Before the IPO, Chinese Authorities Ordered FTA to Heighten Its Protection of Personal Information but FTA Failed to Comply

69.    On April 30, 2021 China's Office of Inter-Ministerial Joint Conference on Collaborative Supervision of New Transportation Business Types ("Inter-Ministerial Joint Conference") held a meeting with FTA and another trucking company. This meeting was called in response to trucker users' complaints against FTA's (and the other trucking company) operational irregularities and problems that damaged truck drivers rights. During this meeting the Inter-Ministerial Joint Conference ordered FTA (and the other trucking company) to rectify the operational irregularities and matters that adversely impacted the truck drivers' rights and interests, including misconduct hurting truckers' welfare, unreasonable pricing mechanisms and unfair operating rules. ("April 30 Meeting").[20]The Office of the Inter-Ministerial Joint Conference announced that it would continuously monitor FTA's (and the other trucking company) rectifications to ensure compliance.[21]

---

[20] http://m.news.cctv.com/2021/04/30/ARTIHN39pZiwniN4uuJwvcFt210430.shtml, last viewed on September 13, 2022.

[21] The Inter-Ministerial Joint Conference was formed by the Chinese central government in 2018 to effectively regulate high-tech companies that provide transportation services. It consists of over ten regulatory agencies of the Chinese central government whose regulatory and enforcement functions involve high-tech companies and/or transportation. The CAC is part of the Inter-Ministerial Joint Conference.

70.     However, FTA's rectifications satisfied neither the Inter-Ministerial Joint Conference nor truckers. Their activities damaging truckers' rights had caused nationwide attention and concern. Under the pressure, on May 14, 2021, the Inter-Ministerial Joint Conference, including the CAC, held a second meeting with FTA, together with another 9 transportation app companies ("May 14 Meeting").[22] At the meeting, the Inter-Ministerial Joint Conference, with a much stronger tone, reiterated its demand that the transportation app companies immediately rectify the spate of misconduct damaging truckers' rights. Significantly, the Inter-Ministerial Joint Conference specifically ordered the transportation app companies to heighten the protection of users' personal information.

71.     In response to the Inter-Ministerial Joint Conference's order, FTA submitted certain "materials concerning [its] business practices in user (particularly trucker) protection, pricing, competition and other aspects" to the regulatory authorities for their review. Also as part of its response to the order, on May 20, 2021, FTA published the "correcting and heightening measures" and to do list it promised would take to protect truckers' rights on Weibo, a Chinese microblogging website. The publication stated that that FTA had submitted its measures to the Inter-Ministerial Joint Conference and would accept authorities' directives.[23] These promised actions included, *inter alia*, stopping unfair competition, avoiding price rigging, changing transaction rules. The publication, however, shows that FTA did not take any measures, or promised to take any measures, to heighten its protection of users' personal information.

72.     Yunmanman and Huochebang's app update history kept by wandoujia.com also shows that FTA did not take any measures to correct any problems or heighten its protection of

---

[22] http://www.gov.cn/xinwen/2021-05/16/content_5606813.htm, last viewed on September 13, 2022.
[23] https://www.sohu.com/a/467756797_410964, last viewed on September 13, 2022.

users' personal information prior to the its IPO. The complete collection of the official versions of Yunmanman and Huochebang apps from 2015 to 2022 shows that from 2015 until October 13, 2021, almost 4 months after FTA's IPO, Defendants merely made insignificant updates from previous versions in the two apps.[24] Only versions of the apps published by FTA since October 13, 2021 show that FTA had "fixed certain known problems."

73.     The historic records at wandoujia.com show that the only changes that FTA made in the Yunmanman versions published from January 2021 to June 21, 2021 (the last version published before FTA's IPO) were adding notes to call history, optimizing shipper's profile page, optimizing delivery experience, adjusting My Page's style, optimizing Little Blackboard's visual effect, optimizing tracking display, optimizing the review page. None of these changes are relevant to the heightening of personal information protection. Equally, the only changes that FTA made in the Huochebang versions published from January 2021 to June 3, 2021 (the last version before FTA's IPO) were upgrading GPS tools, optimizing subscriptions, adding the truckers' to do list function, optimizing the document uploading interaction, adjusting My Page's style, optimizing the display of freight details, fixing certain GPS problems. None of these changes are relevant to the heightening of personal information protection either.

74.     The Registration Statement failed to disclose that immediately before FTA's IPO, the Chinese authorities expressly ordered the Company immediately to heighten the protection of personal information, but FTA had taken no measures to heighten the protection of personal information or included such measures in its submission to the Inter-Ministerial Joint Conference, rendering the Registration Statement materially misleading.

---

[24]  https://www.wandoujia.com/apps/6591129/history, last viewed on September 13, 2022; https://www.wandoujia.com/apps/6651759/history, last viewed on September 13, 2022.

75.     Additionally, having taken nomeasures to heighten the protection of personal information nor included such measures in its submission to the Inter-Ministerial Joint Conference, FTA created an imminent, known heightened risk that the regulatory authorities in the Inter-Ministerial Joint Conference, while reviewing FTA's submissions, would find out FTA made no efforts to heighten the data protection and hence could impose material penalties on FTA for FTA's defiance of the Inter-Ministerial Joint Conference's order. These risks that existed at the time of the IPO and which Defendants had a duty to disclose, were omitted from the Registration Statement, further rendering it materially false.

**VI. The Undisclosed Risks Quickly Materialized Damaging Investors**

76.     With the Registration Statement omitting material information and risks, FTA went ahead with its IPO. On May 27, 2021, FTA filed with the SEC a registration statement on Form F-1 for the IPO, announcing its intent to go public on the U.S. market. On June 15, 2021, FTA filed an amended operative Registration Statement on Form F-1/A, which was declared effective on June 21, 2021. On June 23, 2021, the Company filed with the SEC a prospectus for its IPO on Form 424B4, which incorporated and formed part of the Registration Statement. In the IPO, FTA sold to the investing public 82.5 million FTA ADSs at $19/ADS (which would have risen to 94.875 million FTA ADSs if the Underwriter Defendants had exercised their overallotment option). Defendants generated over US$1.56 billion in gross offering proceeds from the IPO. On its first day of trading, FTA ADSs closed at $21.50, giving the Company a market capitalization of approximately $23.6 billion. Contemporaneous with the IPO, the Company additionally raised $200 million from Ontario Teachers' Pension Plan and an entity affiliated with Abu Dhabi sovereign wealth fund Mubadala Investment Company PJSC in a private placement of FTA's

shares. Thus, in total, the Company raised over US$1.76 billion in gross proceeds at the time of the IPO.[25]

77.     In its Registration Statement, FTA touted its ability to "rapidly grow[]" users as the first and most important strength that "position[es FTA] well to capitalize on the opportunities of a massive and rapidly changing road transportation market in China." FTA also acknowledged that "[its] growth and expansion will depend on[, inter alia, its] ability to attract and retain shippers and truckers on [its] platform."

78.     The Registration Statement, however, did not disclose the Chinese authorities' express order that the Company heighten the protection of personal information or FTA's failure to make any efforts to heighten such protection in response to the order. Nor did the Registration Statement disclose the imminent and known material risk that regulatory authorities could impose material penalties for such failure.

79.     The risk quickly materialized in two weeks of FTA's IPO.

80.     On July 5, 2021, citing, among other things, the Cybersecurity Law, the CAC announced that "to prevent national data security risks, maintain national security, and protect public interests", it had launched a cybersecurity review of Yunmanman and Huochebang. The CAC also announced that it suspended the two apps' new user registration "in order to accommodate cybersecurity review and prevent the expansion of risks" ("July 5 Announcement"). On the same day, FTA disclosed the July 5 Announcement. FTA's ADS price started to plunge.

---

[25] The Registration Statement warned that "[n]o dealer, salesperson or other person is authorized to give any information or to represent as to anything not contained in this prospectus or in any free writing prospectus we may authorize to be delivered or made available to you. You must not rely on any unauthorized information or representations."

By the commencement of this action, FTA's ADSs fell 17% from its IPO price trade below its IPO price and $3.6 billion market value was wiped out. As a result, investors were damaged.

## VII. Defendants Had an Affirmative Obligation to Disclose Material Risks And Uncertainties Under SEC Regulations.

81.    Provisions of SEC Regulation S-K govern the duty of affirmative disclosure imposed upon filers of various reports under the Securities Act and the Securities Exchange Act. In connection with the IPO, these regulations imposed on each Defendant the duty to disclose in the Registration Statement Defendants' failure to take measures to heighten personal information protection and its associated imminent and known material risk.

17 C.F.R. §229.105 – Item 105 (Risk Factors) [26]

82.    Issuers are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105.[27] The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

83.    Immediately before FTA's IPO, the Inter-Ministerial Joint Conference expressly ordered FTA to heighten its protection of personal information as part of the rectification undertaking. FTA made certain changes and submitted materials on its business practices and

---

[26] Item 105's requirements were previously set forth in 17 CFR §229.503 ("Item 503"). On April 2, 2019, the SEC relocated Item 503(c) to Item 105 of Regulation S-K.

[27] Item 105 was amended in October 2020, to expand the scope of required disclosure from "the most significant factors" to "material factors." The purpose of the revision was to "focus registrants on disclosing the risks to which reasonable investors would ***attach importance in making investment or voting decisions***." *See* 85 F.R. 63761, 63744-45 (Oct. 8, 2020).

rectification measures and plans to the regulatory authorities for review. At the time of the IPO, the review was still pending. In defiance of the regulatory authorities' express order, FTA failed to heighten its protection of personal information and failed to make any plans in this respect. Hence, FTA was faced with a present material risk that regulatory authorities could impose significant penalties on FTA when the authorities were to find out such failure upon reviewing FTA's submissions. This made an investment in ADSs that FTA was offering speculative and risky. Thus, Defendants had a duty to disclose their failure to comply with the regulatory authorities' express order and the associate known material under Item 105.

Form F-1 – Item 5(D) (Material Events and Uncertainties)

84.     SEC Regulation S-K (17 C.F.R. 229.10) provides that registration statements such as the one filed by FTA on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." Part I, Item 4(a) of Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

85.     Part I, Item 5(D) Form 20-F, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

86.     Even a one-time regulatory event, if "reasonably expect[ed]" to have a material impact on the company must be disclosed.

87.     Item 5(D) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K".[28]  And pursuant to Item 303, issuers must disclose actual and contemplated regulatory action

---

[28] *See also* SEC Division of Corporation Finance's *Financial Reporting Manual* ("FRM") which provides: "The requirements for MD&A [Management's Discussion & Analysis] are set forth in

or "changes in" the "regulatory environment[.]"  *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 nn.1, 27.

88.    Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[29]

89.    Item 5(D) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

90.    Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989

---

Item 5 of Form 20-F, under Operating and Financial Review and Prospects (sometimes referred to as the OFR). This Item calls for the same disclosure as S-K 303 …" FRM §9410.1.  FRM §9410.2 further provides: "The requirements of Item 5 of Form 20-F are as follows:   … d. Trend information – Item 5.D."

[29] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

Interpretive Release provides the following test to determine if disclosure under Item 303(a) or

Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6

91.     Issuers must disclose regulatory actual or contemplated regulatory action, as shown

by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.

> Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*Id.* at *6.

92.     Issuers must disclose both (a) known trends and uncertainties and (b) any potential

material impact of known trends and uncertainties on their own operations even if the trends are a

matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

93.     Indeed, as a foreign issuer, FTA faces heightened obligations to disclose government action. Item 303 specifically instructs foreign private registrants like FTA to "discuss briefly any pertinent governmental economic, fiscal, monetary, or political policies or factors that have materially affected or could materially affect, directly or indirectly, their operations or investments by United States nationals." 17 C.F.R. § 229.303, ¶12. There is no corresponding specific requirement for domestic companies.

94.     Immediately before the IPO, the Inter-Ministerial Joint Conference ordered FTA to heighten the protection of personal information. But FTA failed to comply with the order. At the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance with the Inter-Ministerial Joint Conference's order and had not made any determination. Therefore, at the time of the IPO, there was a reasonable likelihood that the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order upon the conclusion of the review. Thus, pursuant to Item 5(D), FTA had an affirmative duty to disclose its failure to comply the Inter-Ministerial Joint Conference's order to heighten the protection of personal information and the attendant imminent material risks in the Registration Statement.

## VIII. Defendants Were Aware of the Importance of Complying with Cybersecurity Law Prior to and During the IPO

95.     In the Registration Statement, Defendants disclosed that FTA generates, collects, stores and processes a large amount of data, which include sensitive personal information. They admitted that improper collection, use or disclosure of such data by FTA could materially and

adversely affect FTA's reputation, business, results of operations and financial condition.

96.     Due to the nature of its operations and possession of logistical and personal data, FTA understood that it was "subject to various data privacy and protections laws and regulations in China, including without limitation, the PRC Cybersecurity Law." At two locations in the Registration Statement, including in the Risk Factors section, FTA extensively discussed its duties to safeguard personal information and cybersecurity under the Cybersecurity. The Registration Statement particularly highlighted the material adverse effects that non-compliance with the Cybersecurity Law could bring to FTA.

97.     In the Registration Statement, FTA specifically explains that the CAC as one of the four regulatory authorities that enforced data privacy and protections laws and regulations in China. FTA explained in the Registration Statement that the CAC's regulations on personal information protection as part of the most significant rules and regulations that affect FTA's business activities, accentuating the importance of complying with the CAC's orders and regulations. Notably, the Registration Statement alerted the investing public that Chinese "regulators have been increasingly focused on regulation in the areas of data security and data protection."

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE REGISTRATION STATEMENT

98.     The Registration Statement failed to disclose, pursuant to Items 105 and 303, that immediately before the IPO, the Inter-Ministerial Joint Conference ordered FTA to heighten the protection of personal information as part of the rectification undertaking. But FTA failed to comply with the order; at the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance with the Inter-Ministerial Joint Conference's order to rectify and had not made a determination; therefore at the time of the IPO, there was a reasonable

likelihood that the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order upon the conclusion of the review, which was reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition and also had rendered investment in the FTA ADSs risky.

99.    Additionally, the Registration Statement states, in the relevant part, that

As of date of this prospectus, we have not been subject to any material fines or other penalties due to any material violations of applicable PRC laws or regulations. However, if the PRC government continues to tighten its regulatory framework for the road transportation and internet service industries in the future, and subject industry participants such as our company to new or specific requirements, such as licensing requirements, or require us to adjust our existing business practices, our business, financial condition and prospects would be materially and adversely affected. ***Recently, we, together with other industry players, were requested to attend certain regulatory guidance meetings and subsequently, furnish materials concerning our business practices in user (particularly trucker) protection, pricing, competition and other aspects to the relevant regulators for their review.*** Going forward, we may continue to be required to attend similar meetings or become subject to regulatory inquiries or investigations with PRC regulators. There is no guarantee that such regulatory communications would not result in substantial penalties or orders that require us to adjust our existing business practices in ways that may materially and adversely affect our growth and results of operations.

(Emphasis added.)

100.    The statements referenced above were materially false and misleading because they failed to disclose that (i) immediately before the IPO, the Inter-Ministerial Joint Conference expressly ordered FTA to immediately rectify a number of misconduct including, *inter alia*, misconduct concerning truckers' rights, unreasonable pricing mechanisms and unfair operating rules; particularly, the Inter-Ministerial Joint Conference expressly ordered FTA to heighten the protection of personal information; (ii) FTA defied the Inter-Ministerial Joint Conference's express order and failed to heighten the protection of personal information; (iii) at the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance

with the Inter-Ministerial Joint Conference's order to rectify; (iv) therefore at the time of the IPO, FTA was faced with an imminent known significant risk that upon the conclusion of the review, the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order to heighten FTA's protection of personal information.

101.    The above risk disclosures were materially misleading because they failed to disclose the Company's non-compliance with the regulatory authorities' express order nor the potential material penalties for such non-compliance. These general risk disclosures about future risks resulting from unknown future are not substantive or specifically tailored to apprise the investing public of the *specific known* risk resulting from the FTA's non-compliance.

102.    The Registration Statement also states, in the relevant part, that

> While we have adopted a rigorous and comprehensive policy for the collection, processing, storage and other aspects of data use and privacy and taken necessary measures to comply with all applicable data privacy and protection laws and regulations, we cannot guarantee the effectiveness of these policies and measures undertaken by us, or business partners on our platform. ***In the past, we received notices from regulatory authorities that identified certain compliance defects in our data privacy and protections practices, requiring us to rectify our data privacy measures, without imposing any penalty on us. We have adopted several remedial measures in response to such notices and submitted our rectification reports to the relevant governmental authorities.*** Despite the absence of any material cybersecurity breach and our continuous efforts to comply with our internal policies as well as applicable laws and regulations, any failure or perceived failure to comply with all applicable data privacy and protection laws and regulations, any failure or perceived failure of our business partners to do so, or any failure or perceived failure of our employees to comply with our internal control measures, may result in negative publicity and legal proceedings or regulatory actions against us, and could result in fines, revocation of licenses, suspension of business operations or other penalties or liabilities, which may in turn damage our reputation, discourage current and potential shippers and truckers from using our services, and subject us to fines and damages, which could have a material adverse effect on our business and results of operations.

(Emphasis added.)

103.    The statements referenced above were materially false and misleading because

these statements implied that regulatory notices requiring FTA to rectify its data protection measures had been resolved at the time of the IPO; there were no specific known pending regulatory inquiries or reviews relating to data protection at the time of the IPO. These statements failed to disclose that (i) immediately before the IPO, the Inter-Ministerial Joint Conference expressly ordered FTA to immediately make rectifications, including to heighten the protection of personal information; (ii) FTA defied the Inter-Ministerial Joint Conference's express order and failed to adopt any remedial measures to heighten the protection of personal information; (iii) at the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance with the Inter-Ministerial Joint Conference's order to rectify; (iv) therefore at the time of the IPO, FTA was faced with an imminent known significant risk that upon the conclusion of the review, the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order to heighten FTA's protection of personal information.

104.    The above risk disclosures were materially misleading because they failed to disclose the Company's non-compliance with the regulatory authorities' express order nor the potential material penalties for such non-compliance. These general risk disclosures about future risks resulting from unknown future are not substantive or specifically tailored to apprise the investing public of the ***specific known*** risk resulting from the FTA's non-compliance.

105.    In the Underwriting Agreement attached to and incorporated into FTA's Registration Statement as Exhibit 1.1, Defendants represented that:

> *Absence of Violations, Defaults and Conflicts.* **Neither the Company nor any of the Controlled Entities** is (A) in violation of its business license, where applicable, memorandum and articles of association, charter or by-laws or similar organizational document, (B) **in violation of any law, order,** rule or regulation judgment, order, writ or decree applicable to the Company or any Controlled Entity of any court, stock exchange or **any government, regulatory body, administrative**

***agency or other governmental body having jurisdiction, except as disclosed in the Registration Statement, the Pricing Prospectus and the Prospectus under the caption "Risk Factors"*** or (C) in default in the performance or observance of any obligation, agreement, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement, lease or other agreement or instrument to which it is a party or by which it or any of its properties may be bound, except for in the case of (B) and (C), such violations that would not, singly or in the aggregate, result in a Material Adverse Effect. [30]

(Emphasis added.)

106.    The statements referenced above were materially false and misleading because they failed to disclose that (i) immediately before the IPO, the Inter-Ministerial Joint Conference expressly ordered FTA to immediately rectify a number of misconduct including, *inter alia*, misconduct concerning truckers' rights, unreasonable pricing mechanisms and unfair operating rules; particularly, the Inter-Ministerial Joint Conference expressly ordered FTA to heighten the protection of personal information; (ii) FTA defied the Inter-Ministerial Joint Conference's express order and failed to heighten the protection of personal information; (iii) at the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance with the Inter-Ministerial Joint Conference's order to rectify; (iv) therefore at the time of the IPO, FTA was faced with an imminent known significant risk that upon the conclusion of the review, the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order to heighten FTA's protection of personal information, a material adverse effect.

---

[30] The Underwriting Agreement defines a Material Adverse Effect as a material adverse effect on the condition (financial or otherwise), results of operations, management, business, properties or prospects of the Company and the Controlled Entities taken as a whole, or prevention of the consummation of the transactions contemplated in the Underwriting Agreement.

## THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT

107.    Each Underwriter Defendant is an investment banking firm whose activities include, inter alia, the underwriting of public offerings of securities.

108.     In the Underwriting Agreement, attached to the Registration Statement, the non-lead underwriters gave to the Lead Underwriters full legal authority to act on their behalf in connection with their underwriting of the IPO. In communications with the SEC, Lead Underwriters stated that they are acting as representatives for all of the underwriters. Thus, the actions of Lead Underwriters bound the non-lead underwriters in connection with the IPO.

109.    The Underwriter Defendants participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. The Underwriter Defendants' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

110.    As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

111.    The Underwriter Defendants also assisted FTA and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence," the Underwriter Defendants

had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

112.    In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to FTA's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which FTA's ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about FTA would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and FTA's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of FTA's undisclosed then-existing problems and the Registration Statement's materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

113.    The Underwriter Defendants also demanded and obtained an agreement from FTA under which FTA agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

114.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Individual Defendants, could offer to sell, and sell, FTA ADSs to Plaintiffs and the members of the Securities Act Class pursuant (or traceable) to the Registration Statement.

115.    Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement. 15 U.S.C. § 77k(a)(5).

116.    Section 11 provides that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

117.    In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement. The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value.  The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process.  The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

118.    It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

119.    It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for FTA's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

120.    Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, Goldman Sachs published the *Report of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also acknowledges its role as a gatekeeper stating: "[a]n underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

121.    In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering."  (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting FTA's

ADSs. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

122.    Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Registration Statement and the Prospectus, an investment bank must make full disclosure, or not sponsor the financing if full disclosure is not to be provided. If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing. When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

123.    The Underwriter Defendants failed to conduct a reasonable due diligence investigation with regard to FTA's IPO. In particular, the Underwriters Defendants, had they performed adequate due diligence, would have discovered that (i) immediately before the IPO, the Inter-Ministerial Joint Conference expressly ordered FTA to immediately make rectifications, including to heighten the protection of personal information; (ii) FTA defied the Inter-Ministerial Joint Conference's express order and failed to adopt any remedial measures to heighten the protection of personal information; (iii) at the time of the IPO, the regulatory authorities were still reviewing FTA's submissions showing its compliance with the Inter-Ministerial Joint Conference's order to rectify; (iv) therefore at the time of the IPO, FTA was faced with an imminent known significant risk that upon the conclusion of the review, the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order to heighten FTA's protection of personal information.

124.     The Underwriter Defendants' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

## THE DIRECTORS' AND OFFICERS' DUE DILIGENCE OBLIGATIONS AND VIOLATIONS OF THE SECURITIES ACT

125.     The senior management of FTA, including the Individual Defendants, as executive officers and authorized representatives of FTA, participated in the solicitation and sale of FTA securities to investors in the IPO, motivated to serve their own and the Company's financial interests.

126.     The Individual Defendants, along with other FTA senior executives, attended investor roadshow presentations and met with investment analysts and large investors in the weeks leading up to the IPO in an effort to persuade investors that FTA was a worthy investment and solicit investors to purchase FTA securities in the IPO, all to further the financial interests of FTA. Each of the Individual Defendants:

a.     directly participated in the management of the Company;

b.     was directly involved in the day-to-day operations of the Company at the highest levels;

c.     was privy to confidential proprietary information concerning the Company and its business and operations;

d.     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.    approved or ratified these statements in violation of the federal securities laws.

127.    As directors and/or officers of FTA and as signatories to the Registration Statement, each of the Individual Defendants had a duty to conduct a thorough due diligence investigation of FTA's operations and ensure that all of the statement in the Registration Statement were true, and not misleading in any respect.

128.    The Individual Defendants had the ability and duty to inquiring into any and all pending regulatory reviews that could result in material risks to FTA's business and operation. At least one FTA executive attended the May Meeting on behalf of FTA and reported to FTA about the Chinese authorities' orders issued at the meeting.

129.    The Individual Defendants were negligent for failing to inquiring into the Inter-Ministerial Joint Conference's meeting and pending review.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

130.    Plaintiffs bring this action as a class action on behalf of all those who purchased FTA ADSs pursuant and/or traceable to the Registration Statement (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

131.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by FTA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

133.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

134.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)       whether Defendants violated the federal securities laws;

b)       whether the Registration Statement misrepresented material facts;

c)       whether the Registration Statement omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)       whether the Class members have sustained damages and, if so, what is the proper measure of damages.

135.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### Violations of Section 11 of the Securities Act
### Against All Defendants Concerning
### the Registration Statement

136.     Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-135 as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

137.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

138.     The Registration Statement omitted to state facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

139.     The Defendants named in this Count signed the Registration Statement and/or was a director at the time of the filing of the Registration Statement.

140.     Defendants are strictly liable to Plaintiffs and the Class for the omissions in the Registration Statement.

141.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

142.     Plaintiffs acquired FTA ADSs pursuant to the Registration Statement.

143.     At the time of their purchases of FTA ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

144.     This claim is brought within one year after discovery of the material omissions in the Registration Statement that should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore

timely.

## COUNT II
### Violations of Section 15 of the Securities Act
### Against the Individual Defendants and De Vries

145.    Plaintiffs repeat and re-allege the allegations set forth in ¶¶ 1-144, as if fully set forth herein. Plaintiff further disclaims any allegation of fraud, recklessness or intentional misconduct.

146.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and De Vries, each of whom was a control person of FTA during the relevant period.

147.     The Individual Defendants and De Vries were in positions to control and did control, the false and misleading omissions contained in the Registration Statement.

148.     None of the Individual Defendants and De Vries made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material omissions alleged herein.

149.    Plaintiffs and the Class have sustained damages. The value of FTA ADSs has declined substantially due to the Securities Act violations alleged herein.

150.    This claim is brought within one year after discovery of the material omissions in the Registration Statement that should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## ADDITIONAL ALLEGATIONS IN SUPPORT OF
## EXCHANGE ACT CLAIMS

**SCIENTER**

151.    At the time of the IPO, FTA was facing the approaching gloomy prospect that Chinese authorities would not allow Chinese companies that lacked proper data security to be subject to the laws of foreign jurisdictions or list their securities on a foreign exchange under the soon-to-come-into-effect Data Security Law and the Personal Information Protection Law. Therefore, FTA was under the tremendous now-or-never pressure to rush its IPO before the door to listing on the U.S. market was virtually closed.

152.    At the time of the IPO, FTA knew that the Chinese authorities were still reviewing the Company's rectification measures and there was an imminent known significant risk that upon the conclusion of the review, the regulatory authorities would impose material penalties on FTA for its defiance to the Inter-Ministerial Joint Conference's order to heighten FTA's protection of personal information. FTA concealed the material facts to protect its all-time-high company valuation and hastened the IPO.

**LOSS CAUSATION – THE TRUTH EMERGES**

153.    Then on July 5, 2021, FTA issued a press release entitled "Full Truck Alliance Announces Cybersecurity Review in China" which announced, in pertinent part, that:

> … pursuant to an announcement issued by the Cybersecurity Review Office ("CRO") of the Cyberspace Administration of China on July 5, 2021, CRO has initiated a cybersecurity review of FTA's Yunmanman apps and Huochebang apps. In order to facilitate the review and prevent the expansion of potential risks, these mobile apps are required to suspend new user registration in China during the review period.
>
> FTA will fully cooperate with CRO during the cybersecurity review process. FTA is conducting a comprehensive self-examination of any potential cybersecurity

risks and will continue to improve its cybersecurity systems and technology capabilities. FTA hopes its full cooperation will assist CRO to complete its review process smoothly.

154.    On this news, FTA ADSs fell $1.27 per ADS, or over 6%, with heavy trading volume, to close at $17.75 per ADS on July 6, 2021, the next trading day, damaging investors. FTA's ADS price continued to fall 4.2% and 11% on July 7 and 8, 2021 respectively, to close at $15.13/ADS on July 8, 2021. The three declines collectively erased approximately $3 billion in shareholder value.

155.    As a result of Defendants' material omissions, and the precipitous decline in the market value of FTA's ADSs, Plaintiffs and other Class members have suffered significant losses and damages.

## *RESPONDEAT SUPERIOR* AND LIABILITY UNDER SECTION 20 OF THE EXCHANGE ACT

156.    FTA is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

157.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to FTA under *respondeat superior* and agency principles.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### *AFFILIATED UTE*

158.    The statements made by the Exchange Act Defendants during the Class Period were misleading for omitting to disclose information concerning the Exchange Act Defendants' failure to heighten its protection of personal information at the Chinese government's order and the attendant material risk.

159.    Neither Plaintiffs nor the Class need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that FTA withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**APPLICATION OF PRESUMPTION OF RELIANCE:**

**FRAUD ON THE MARKET**

160.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) the Exchange Act Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) FTA ADSs were traded in efficient markets during the Class Period.

161.    FTA's ADSs traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NYSE; (ii) on average shares representing more than 2.0% of the securities' float were traded weekly during the Class Period; (iii) During the Class Period, FTA was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available; (iv) FTA met the criteria for eligibility to file an S-3 Registration Statement during the Class Period; (v) FTA regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major

newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (vi) the price of FTA ADSs responded quickly to incorporate and reflect new public information concerning FTA during the Class Period; (viii) more than ten market makers made a market in FTA ADSs during the Class Period.

### COUNT III
### For Violations of Section 10(b) And Rule 10b-5 Promulgated
### Thereunder Against All Exchange Act Defendants

162.    Plaintiffs repeat and reallege each and every allegation set forth in ¶¶1-161 as if fully set forth herein.

163.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

164.    During the Class Period, Exchange Act Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

165.    Exchange Act Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

a.    employed devices, schemes and artifices to defraud;

b.    omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FTA securities during the Class Period.

49

166.    Exchange Act Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of FTA were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of FTA, their control over, and/or receipt and/or modification of FTA's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FTA, participated in the fraudulent scheme alleged herein.

167.    Exchange Act Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other FTA personnel to members of the investing public, including Plaintiffs and the Class.

168.    As a result of the foregoing, the market price of FTA ADSs was artificially inflated during the Class Period. In ignorance of the falsity of Exchange Act Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of FTA ADSs during the Class Period in purchasing FTA ADSs at prices that were artificially inflated as a result of Exchange Act Defendants' false and misleading statements.

169.    Had Plaintiffs and the other members of the Class been aware that the market price of FTA ADSs had been artificially and falsely inflated by the material adverse information which

Defendants did not disclose, they would not have purchased FTA ADSs at the artificially inflated prices that they did, or at all.

170.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

171.    By reason of the foregoing, Exchange Act Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the members of the Class for substantial damages which they suffered in connection with their purchase of FTA ADSs during the Class Period.

### COUNT IV
### Violations of Section 20(a) of the Exchange Act
### Against Defendants Zhang and Cai

172.    Plaintiffs repeat and reallege each and every allegation as set forth in ¶¶1-171 as if fully set forth herein.

173.    During the Class Period, Defendants Zhang and Cai participated in the operation and management of FTA, and conducted and participated, directly and indirectly, in the conduct of FTA's business affairs. Because of their senior positions, they knew the adverse non-public information about FTA's misstatement of revenue and profit and false financial statements.

174.    As officers and/or directors of a publicly owned company, Defendants Zhang and Cai had a duty to disseminate accurate and truthful information with respect to FTA's financial condition and results of operations, and to correct promptly any public statements issued by FTA which had become materially false or misleading.

175.    Because of their positions of control and authority as senior officers Defendants Zhang and Cai were able to, and did, control the contents of the various reports, press releases and public filings which FTA disseminated in the marketplace during the Class Period concerning FTA's results of operations. Throughout the Class Period, Defendants Zhang and Cai exercised

their power and authority to cause FTA to engage in the wrongful acts complained of herein. Defendants Zhang and Cai therefore, were "controlling persons" of FTA within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FTA common shares.

176.    By reason of the above conduct, Defendants Zhang and Cai are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FTA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, prays for judgment and relief as follows:

a.    declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel for Plaintiffs as Class Counsel;

b.    awarding damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, together with interest thereon;

c.    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: September 13, 2022                    Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**

                                            */s/Phillip Kim*
                                            Phillip Kim, Esq.
                                            Laurence M. Rosen, Esq.
                                            Jing Chen, Esq.
                                            275 Madison Ave., 40th Floor
                                            New York, NY 10016
                                            Tel: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Emails: pkim@rosenlegal.com
                                                     lrosen@rosenlegal.com
                                                     jchen@rosenlegal.com

                                            *Lead Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of September 2022, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS was served by CM/ECF to the parties registered to the Court's CM/ECF system.


<u>/s/Phillip Kim</u>